## Commonwealth v. McNutt

*Gary L. Sweat,* for prosecutrix.
*David S. Posner,* for defendant.

SWEET, *P.J.,* June 18, 1982—Florence and James McNutt were married on December 28, 1969, in Erie, Pa. This marriage followed an unusual courtship, conducted entirely by correspondance and telephone, as "penpals," and the marriage arrangements were made the first day the parties saw each other.

Florence was in the unfortunate position of having borne a baby to a soldier who disappeared into the jungles of Viet Nam and had never been heard from since. She lived in New Mexico while McNutt was serving at Fort Sill, Oklahoma. The aspiring bridegroom promised Florence's father that he would take care of her and of little Melissa as though she were his own. Florence's father gave his consent to the marriage and she came East with her baby and married McNutt.

The parties lived together well enough until 1977 or 1978 and a boy, Martin, was born to them during the early part of the marriage.

In connection with the divorce proceedings an agreement was drawn up by counsel for him. This

instrument, which is a part of the record, does not use the names of Melissa and Martin, rather it says this:

"1. The husband agrees to provide for the support of their minor child by paying the sum of One Hundred fifty and no/100 ($150.00) Dollars per month so long as the child is a minor and under the care of the wife.

2. It is agreed between the husband and wife that the wife shall continue to have custody of the child, provided, however, that the husband shall be entitled to reasonable visitation, at reasonable hours, but no less than one day per week."

It is noted that at the time of the divorce, McNutt was making a little less than $10,000, so the support amount would be high for one child here, although not lavish for two.

During the period that Florence and James lived together he treated Melissa in an exemplary way and lived up to his engagement to her mother and his promise to her. Now however, he wants to pay only on Martin. This case concerns payments for Melissa.

The undersigned, hearing the proof at a nonjury, counseled hearing, finds as a fact that McNutt did promise to take care of Melissa as though she were his own and that, furthermore, he treated the child in such a way for a period of many years.

It was said in Commonwealth ex rel., Bulson v. Bulson, 278 Pa. Super. 6, 419 A.2d 1327 (1980),

"However, this court has stated that a stepfather who lives with his wife and her natural child may assume the relationship to the child of in loco parentis . . . The rights and liabilities arising out of that relationship are in many respects the same as between parent and child."

The court went on to hold,

". . . the lower court nevertheless had ample evidence from which to infer that appellant assumed the obligation himself when he married appellee, knowing that she had a child in need of support. We therefore conclude that the lower court did not abuse its discretion in taking into account the cost to appellee of supporting her child."

Momjian and Perlberger's Pennsylvania Family Law, the standard book in the field, says on page 151 of the 1982 supplement,

"6.10.1(b) The 'In Loco Parentis' Doctrine.

This rule was further extended in Com. ex rel. Bulson v. Bulson. The court concluded that even in the absence of an agreement, a stepfather had assumed financial responsibility for the child by marrying a woman with a child in need of support." See also Spells v. Spells, 250 Pa. Super. 168, 378 A.2d 879 (1977) and Commonwealth v. Cameron, 197 Pa. Super. 403, 179 A.2d 270 (1962). The Cameron case comes from this county and was decided at the Superior Court level by the distinguished Judge Flood. The Cameron case concludes with this paragraph:

"In a case very similar to this, Judge McCreary held that a mother and her second husband had assumed a primary obligation for the support of the child, and unless and until the child becomes a burden on the state, their agreement to assume a position in loco parentis must stand. Beck v. Freed, 3 D.&C. 2d 105 (1955). We think this states the principle which properly governs the case before us, and in the absence of a showing that the cost of maintenance of the child has become a burden upon the public, no order may be properly against the father."

In our case the father has not even been heard of since 1969 and as noted hereinabove, may well have

perished in Viet Nam. There is no one else to visit Melissa's cost of living upon except James and Florence.

The Spells case, supra., was visitation, being a unanimous decision of the Superior Court when it had seven members. It defines and discusses the doctrine "in loco parentis." Judge Hoffman said there that this status,

". . . embodies two ideas; first, the assumption of a parental status, and second, the discharge of parental duties."

The evidence is plain on the point here. As recently as September of 1981, in a story in the Washington Observer, where McNutt is employed, there is a picture of little Martin entitled "Area Youngster Winner In Photography Contest." and among the also-rans, "Melissa McNutt, daughter of Jim McNutt . . ."

McNutt's testimony included the fact that he has continued to visit with Melissa, at least fortnightly, since the 1977 divorce. He recently gave her a $500 U.S. Bond. I was careful to ascertain that this was not intended as support, but as a gift, to become available to her on her 21st birthday.[1] He also gave Martin such a bond.

---

1. In a New York case, Rutkowski v. Wasko, 143 N.Y.S. 2d 1, (1955), where it was to the child's best interest that a stepfather be found not to be in loco parentis (because it would deny the child a tort recovery), we find an excellent exposition of the doctrine of in loco parentis. I think in the case at bar McNutt meets the rather stringent New York standards of the following dictum:

"A step-father does not merely by reason of such relationship acquire a parental status. In loco parentis refers to a person who has fully put himself in the situation of a lawful parent by assuming all the obligations incident to the parental relationship and who actually discharges those obligations. A step-father who furnishes a bed and provides bread for a minor

"A person in loco parentis is one who means to put himself in the situation of a lawful parent to a child with reference to the office and duty of making provision for the child, or one who actually assumes the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption."[2]

I find that McNutt qualifies either way. He entered into an engagement to do this at the time of the marriage and partially in order to procure it. He has behaved himself in the same way ever since. The record includes two letters from McNutt to his former wife.

---

son of his wife by a former mariage and who exercises some control over him does not, by those acts alone, establish a parental relationship. To establish such a relationship, there must be in addition to those factors, an affinity whereby the step-father has a true interest in the well-being and general welfare of his step-son. The assumption of the parental relationship is largely a question of intention which should not lightly or hastily be inferred, but which may be shown by the acts and declarations of the person alleged to stand in that relation. Miller v. U.S., 8 Cir., 123 F.2d 715, 717; Leyerly v. U.S., 10 Cir., 162 F.2d 79. Whether the relationship exists in any particular case will depend on all the facts and circumstances involved. Niewiadomski v. U.S., 6 Cir., 159 F.2d 683; Matter of Lutz' Estate, 201 Misc. 539, 107 N.Y.S.2d 388. The relationship should be found to exist only if the facts and circumstances show that the step-parent means to take the place of the lawful father not only in providing support but also with reference to the natural father's office of educating and instructing and caring for the general welfare of the child. Whether a step-father with whom a minor resides stands in loco parentis is generally a question of fact to be resolved in the same manner as other factual problems arising in common-law actions. Where the evidence on the issue is in conflict or where different inferences may reasonably be drawn from the evidence, the issue should not be resolved as a matter of law."

2. See P.L.E. Parent and Child, Section 17.

"I cannot imagine making a life without Missy and Martin. I really can't. They mean everything to me. Funny how they get to me — I guess you never really appreciate something till it's gone and you know it's not coming back."

In the other letter he sent a message to Melissa:

"Missy . . . You take good care and remember that Daddy loves you . . ."

The parties once went to Attorney David Gilmore to inquire about having a formal adoption. They differed on their explanation of why they didn't go through with the adoption, but apparently the advertising bothered them in different ways. McNutt had treated this child so expressly as his own that it is understandable why he did not wish it to be known in the community that she was not his natural child.

The paragraph in the contract which does not mention Melissa by name is not fatal to this disposition of the case. The husband and wife cannot contract to insure the child will *not* have support.

Marter v. Ross, 294 Pa. Super. 241, 439 A.2d 1181, (1980), quoted in defendant's brief for the proposition that the husband "is under no obligation to support his wife's children by a previous marriage." is not enough like the case at bar to be apropos. It is obvious, as Judge Watkins said in his opinion here, that,

"A support order cannot rest upon the speculation of the trial judge as to the extent of a parent's income when there is no evidence of that income on record."

## ORDER

We therefore make a finding that James McNutt is obligated to provide support for Melissa and set

June 29, 1982, as the date to take testimony on the income of the respective parties. Said hearing will be held in Courtroom no. 1 at 3:00 p.m.

